UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GWENDOLYN D CUNNINGHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-00165-SEB-TAB |
| | ) | |
| LLOYD J AUSTIN in His Official Capacity as | ) | |
| Secretary of the U.S. Department of Defense, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Gwendolyn D. Cunningham ("Ms. Cunningham") filed this lawsuit against her employer, Defendant Lloyd J. Austin ("Defendant"), in his official capacity as Secretary of the United States Department of Defense, alleging that she was denied a promotion based on her race and sex, in violation of Title VII. *See generally* 42 U.S.C. § 2000e-2. Defendant moved for summary judgment. Dkt. 44. For the reasons explained below, Defendant's Motion for Summary Judgment is **GRANTED**.

## I.    STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The summary judgment standard requires "no *genuine* issue of *material* fact," meaning that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247−48 (1986) (emphasis in original).

1

Material facts are those that "might affect the outcome of the suit," and a dispute of material fact is genuine when "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

Summary judgment is neither "a vehicle for resolving factual disputes" nor a means to a "paper trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). As such, in evaluating a summary judgment motion, the district court need not "sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Id.* Indeed, those tasks belong to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). "The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920 (citing *Anderson*, 477 U.S. at 249–50). When deciding whether a genuine dispute of material fact exists, the court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572 (7th Cir. 2021).

At summary judgment, parties may support their assertions of undisputed facts by citing to record materials, including affidavits, declarations, and depositions. *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 955 (7th Cir. 2021) (citing Fed. R. Civ. P. 56(c)(1)(A)). Despite the reality that these record materials "by their nature are self-serving," they are nonetheless admissible on a summary judgment motion. *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013).

Recognizing that summary judgment motions are often "tedious and time consuming," our Local Rules require parties to "submit factual statements to assist with identifying

and isolating the disputed from the undisputed—all to help the court assess whether a particular claim should proceed to trial or instead can be resolved on the existing record." *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 527 (7th Cir. 2020) (citing S.D. Ind. L. R. 56-1). Our Local Rules specifically require the non-moving party to respond with a "Statement of Material Facts in Dispute" that "identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." S.D. Ind. L. R. 56-1(b). To comply with this rule, the nonmovant's response "should contain concise statements of fact, not extended statements of argument." *Pike v. Caldera*, 188 F.R.D. 519, 525 (S.D. Ind. 1999)[1]; *see* S.D. Ind. L.R. 56-1 (Advisory Committee Comments Re: 2002 Amendments) (statement of facts must "state facts, not the party's argument"); *Hinterberger*, 966 F.3d at 527 (stating that the Local Rules "prohibit[ ] the inclusion of any argument—which should be saved for briefing"). "[F]actual inferences do not constitute an appropriate inclusion" in a statement of facts, for courts "must have a clear picture of the facts" before deriving reasonable inferences therefrom. *Id.*

## II.    FACTUAL & PROCEDURAL BACKGROUND

Before turning to our recitation of the facts, we pause to comment briefly on Ms. Cunningham's noncompliance with our Local Rules. Her "Statement of Material Facts in Dispute" contains numerous legal arguments, *see*, *e.g.*, Pl.'s Resp. at 9, 11, 19, dkt. 48,

---

[1] Though this decision discusses the since-amended Local Rule on summary judgment procedure, its admonition against integrating legal argument into factual assertions remains consistent with our current rule.

which our Local Rules explicitly prohibit from being inserted as disputed material facts. Ms. Cunningham's intermingling of facts and arguments hinders what ought to be the parties' clear mustering of the facts.

The Seventh Circuit has "repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings." *Stevo v. Frasor*, 662 F.3d 880, 887–88 (7th Cir. 2011). Though we choose not to exercise the full breadth of our authority here (for example, by striking non-compliant portions of Plaintiff's submissions), we remind Ms. Cunningham's counsel of the "responsibility to present th[e] facts in the manner dictated by local court rules." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 562 (7th Cir. 2002).

Notwithstanding the challenges imposed by Ms. Cunningham's non-compliance, we have successfully culled the facts as follow below, drawing all reasonable inferences in Ms. Cunningham's favor.

### A.    Ms. Cunningham's Employment at the Defense Finance and Accounting Service

The Defense Finance and Accounting Service ("DFAS"), a sub-agency of the Department of Defense, is responsible for processing all payments to servicemembers, employees, retirees, annuitants, and major Department of Defense contractors and vendors. Ms. Cunningham began her work for the DFAS in 1988 as a parttime secretary, a position ranked at the GS-4 level.[2] In 1991, Ms. Cunningham transitioned to a fulltime secretarial

---

[2] "GS level" refers to the General Schedule classification and pay system used for most federal civilian jobs. There are fifteen grades, starting at GS-1 and ending at GS-15.

position, and, by 1994, she was promoted to retirement counselor at the GS-5 or 6 level. As a retirement counselor, Ms. Cunningham provided other employees with certain estimates of their predicted monthly annuity payments. She progressed through the ranks while in this role, eventually hitting the GS-7, GS-9, and GS-11 ranks.

The Benefits and Services Division ("Benefits Division"), a division of the DFAS's Human Resources Department, oversees retirement calculations, workers compensation claims, and a Customer Care Center. Prior to a 2018 restructuring, the Benefits Division was led by a GS-14 Benefits Division Chief ("GS-14 Division Chief"), who oversaw three teams: the Benefits and Services team, the Customer Care Center team, and the Workers Compensation team. Each team was led by a specific GS-12 employee: Ms. Cunningham led the Benefits team as Benefits Supervisor, which role she assumed in 2012 after ten years as a team lead; Emanuel Griffin ("Mr. Griffin") led the Customer Care Center as a team lead; and Anita Fisher ("Ms. Fisher") led Workers Compensation as a team lead.

Though similarly ranked as GS-12 positions, team leads had less supervisory responsibilities than supervisors, like Ms. Cunningham, who issued performance evaluations, disciplined employees, and approved requests for two or more days of annual leave. From 2003 to 2018, Ms. Cunningham also served as the acting Chief of Benefits, stepping into that role when it was temporarily vacant due to the current Division Chief's absence.

### B.    New GS-13 Supervisor Position

In Spring 2017, Howard Locke ("Mr. Locke") was promoted from GS-14 Division Chief to GS-15 Director of the Human Resources Shared Services Center. While awaiting his GS-14 replacement, Mr. Locke performed both roles. During this time, he sought to

create opportunities for GS-12 employees to advance to the GS-14 Division Chief role because there had otherwise been no GS-13 openings for those employees to advance through the ranks.

Upon Mr. Locke's request, a Classification team reviewed the Benefits Division's structure and suggested that Mr. Locke convert an existing GS-12 vacancy to a GS-13 position, whose occupant would oversee a newly combined Benefits and Worker's Compensation team. As a result of this revised structure, the GS-12 Benefits Supervisor would become a non-supervisory technical position, and the Workers Compensation team lead would become a non-team lead. The Classification team also conducted a desk audit of various positions within the Benefits Division, and, in relevant part, concluded that the Benefits Supervisor was properly categorized as a GS-12 rank.

In October 2017, the DFAS posted a vacancy announcement for the newly created GS-13 Supervisory Human Resources Specialist (Employee Benefits) position ("GS-13 Supervisor position"), which was open to federal employees, certain qualifying veterans, and other non-federal employees. To qualify for the position, applicants were required to have "[o]ne year of specialized experience equivalent in level of difficulty and responsibility to that of the next lower grade (GS-12) within the federal service, which demonstrates the ability to perform the duties of the position." Dkt. 44-13 at 3. "Specialized experience" meant "advising and guiding senior management and customers regarding employee Health Benefits, Retirement and/or Workers Compensation programs, regulations, policy and standards; training and reviewing the work of team members; and resolving issues involving the administration of benefits, retirement or workers compensation programs."

6

*Id.* Because the vacancy was open to certain non-federal applicants, such as disabled veterans, both federal and private sector past employment were considered relevant to a candidate's "specialized experience."

According to the vacancy announcement, the GS-13 Supervisor's responsibilities included:

- Serving as the first line supervisor and manager of day-to-day operations of the Employee Benefits Division;

- Providing advisory and consultative services to employees and managers about the regulations, policy, and program delivery of employee retirement, health and life insurance programs, Thrift Savings Program ("TSP"), and workers compensation program;

- Representing the DFAS to serviced customers by providing high level policy advisory services regarding current or proposed program regulations or service delivery;

- Evaluating program delivery for efficiency and effectiveness and implementing policy and procedural changes to improve operations;

- Providing programmatic analysis of the impact of various benefits programs to assist leadership in short-term and long-term workforce planning; and

- Supervising a team of specialists and support staff to include planning, assigning, and overseeing work, training, and developing staff, and resolving grievances and complaints.

Dkt. 44-13 at 2.

The application window closed on November 6, 2017. Ordinarily, DFAS policy required hiring selections within 120 days of the application's closing date, but because Mr. Locke sought to have the incoming GS-14 Division Chief (to whom the new GS-13 Supervisor would report) to make the selection, he postponed the interviews. Ms. Cunningham evidently shared this understanding, explaining that "interviews were delayed because we had a new person coming in as chief, and I guess management wanted him to be able to review the resumes." Cunningham Dep. 62:12–26, dkt. 44-1.

On April 1, 2018, Andrew Hartz ("Mr. Hartz") (Caucasian male) replaced Mr. Locke as GS-14 Division Chief. Before interviewing candidates for the GS-13 Supervisor position, Mr. Hartz asked Shante Jones ("Ms. Jones") (African American female), then-GS-14 supervisor of Talent Management and Integration, to join him because they had worked together previously, and he knew of her prior experience with HR work processes. Mr. Hartz developed four categories to evaluate candidates: (1) HR & Benefits Subject Matter Expert ("SME"); (2) Supervisory/Leadership skills; (3) Teamwork & Process Innovation; and (4) Customer Service. In each category, Mr. Hartz identified the specific abilities and characteristics that an ideal candidate would demonstrate. Additionally, Mr. Hartz actively consulted with Ms. Jones in developing six interview questions based on the responsibilities listed in the vacancy announcement. These interview questions included the following:

(1)     Describe your background and experience with HR and Benefits. What area of HR/Benefits is your most in-depth experience?

8

(2)    Why do you want to be the Employee Benefits Supervisor?

(3)    If selected, this job will require you to manage the workload of a large team. How do you juggle conflicting priorities?

(4)    Since 2016, HR has had a rapid increase in size (headcount), which presents both opportunities and challenges for our organization. Can you give some examples of how you've developed the technical skills of team members assigned to you?

(5)    As we mentioned in the beginning, this is a new position that will change the structure of the Benefits Division by combining the [Workers Compensation] Team and Employee Benefits. If you were selected, what do you think would be your largest challenge or highest priority in the first 30-90 days?

(6)    What is your style for handling a difficult conversation?

Dkt. 49-15.

## C.    The Applicants & Interviews

Ultimately, four individuals applied for the GS-13 Supervisor position: Ms. Cunningham (African American female), Ms. Fisher (Caucasian female), Mr. Griffin (African American male), and Anthony Opat ("Mr. Opat") (Caucasian male).[3] Mr. Hartz and Ms.

---

[3] Human resources personnel had also created two Certificates of Eligibles, or lists of applicants qualified for the GS-13 Supervisor position. The first list provided candidates who could be hired through Competitive Merit Promotion and included Ms. Cunningham, the two team leads—Ms. Fisher and Mr. Griffin—Mr. Opat, and Tracy Zimmerman ("Ms. Zimmerman"). The other list, the Merit Referral List, provided only Mr. Griffin's name because he was eligible for non-competitive selection based on his status as a thirty percent or more service-connected disabled veteran. Mr. Hartz did not review either Certificate of Eligibles and thus was unaware of the names on these lists.

Jones conducted interviews on May 31, 2018, and June 1, 2018. Approximately ninety minutes before each interview, Mr. Hartz and Ms. Jones disclosed questions three and four to the incoming interviewee, thereby providing each candidate with the benefit of a bit of advance preparation.

Though four candidates applied and interviewed for the position, the following recitation of facts focuses—as did the parties' briefs—on both African American candidates, who were also the finalists for the job, Ms. Cunningham and Mr. Griffin.

### 1.    Ms. Cunningham's Resume & Interview

Ms. Cunningham's two-page resume enumerated only one aspect of her employment history—her current role as a GS-12 Benefits Supervisor, which position she had occupied since 2012. Her resume listed no other experience, education, training, professional licenses, or certificates. Presumably misreading the vacancy announcement, Ms. Cunningham believed the vacancy announcement had instructed applicants to list only five or six years of relevant experience. Cunningham Dep. 46:21–47:4, dkt. 44-1 (describing her "[v]ague memory . . . that the vacancy asked for six years—five, six years of service"). To the extent her resume did not accurately encapsulate her work experience, Ms. Cunningham stated that she "relayed that information in [her] interview." Cunningham EEOC Decl. at 7, dkt. 44-2. Ms. Cunningham also mistakenly omitted the last four digits of her then-supervisor Mr. Locke's phone number. Mr. Hartz, who at this time had only worked

10

with Ms. Cunningham for a short period, *id.* at 62:24–63:1, later recalled that Ms. Cunningham's resume "appeared incomplete." Hartz EEOC Decl. at 8, dkt. 44-21.[4]

Ms. Cunningham recalled that her interview lasted approximately thirty minutes (irrespective of how much time had been allotted by the interviewer). Cunningham Dep. 63:23–24, dkt. 44-1. In his interview notes, Mr. Hartz marked that Ms. Cunningham was the "Best SME" but that her interest in the GS-13 Supervisor position was, at least in part, an effort to maintain "status quo." Dkt. 44-17 at 4. He also described several of Ms. Cunningham's responses as "good . . . but tactical" and another as "practical . . . [between] tactical and strategic."[5] *Id.* at 5–6. When Ms. Cunningham discussed how she developed the technical skills of her team members, she recounted how she personally trained each employee, and Mr. Hartz recorded in his interview notes that "in the current env[ironment] this approach doesn't scale well." *Id.* at 5. Mr. Hartz later "remember[ed] being disappointed" with Ms. Cunningham's interview responses because he believed she did not "fully prepare[ ]" or "capitalize on th[e] opportunity" to prepare thorough answers, despite having received certain questions in advance. Hartz EEOC Decl. at 8, dkt. 44-21. Though

---

[4] Ms. Cunningham objects to our consideration of testimonial evidence from DFAS management officials, like Mr. Hartz, under the "interested witness" rule, which directs courts to ignore controverted evidence submitted by an interested witness or party. Pl.'s Resp. at 23–24, dkt. 48 (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000) (deciding a motion for judgment as a matter of law)). However, the Seventh Circuit has "repeatedly emphasized over the past decade" that "the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Hill*, 724 F.3d at 967. Plaintiff's invocation of this rule, therefore, is groundless, and we shall and do therefore properly consider Defendant's proffered evidence.

[5] Mr. Hartz elaborated in his deposition that "tactical" describes short-term thinking that is focused on the operational aspects of HR, whereas "strategic" describes a longer-term perspective that considers HR as a whole. Hartz Dep. 26:3–27:19, dkt. 44-9.

contesting that she was unprepared, Ms. Cunningham conceded that she "may not have offered as much information as [the interviewers] were looking for" because she "simply tr[ied] to answer the questions as asked, instead of elaborating on things that were not asked." Cunningham EEOC Reply Decl. at 3, dkt. 44-3.

2.    Mr. Griffin's Resume & Interview

Mr. Griffin's nine-page resume captured thirty-two years of education and experience, listing a bachelor's degree in construction engineering technology, a Master's in Business Administration ("MBA"), and a myriad of certifications. After twenty-three years of service in the United States Air Force, Mr. Griffin worked as an Industrial Relations Manager for the City of Indianapolis. In 2009, he joined DFAS as a Labor Management and Employee Relations Specialist, training employees and advising upper management on human resource issues. In 2016, he joined the Benefits Division as the Customer Care Center team lead, in which role he led and operated a call center for matters related to staffing, benefits, and entitlements.

Mr. Griffin estimated that his interview lasted "[p]robably 45 minutes to an hour," despite repeatedly stating that he actually "d[id]n't know" how long it took. Griffin Dep. 40:8–13, dkt. 49-8.  During the interview, Mr. Hartz noted that Mr. Griffin was a "wide SME," albeit "not deep in fed[eral] bene[fits]." Dkt. 44-17 at 10. Mr. Griffin explained that he applied for the position to change the division atmosphere and to lead by example, which struck Mr. Hartz as a "strategic response." *Id.* Mr. Hartz believed that Mr. Griffin had demonstrated "leadership" by crafting an answer from "multiple angles." *Id.* at 11. For half of the interview questions, Mr. Hartz noted that Mr. Griffin gave the "best response" of all

the candidates. *Id.* at 11–12. In describing Mr. Griffin's interview, Mr. Hartz remembered that Mr. Griffin "brought more of a strategic view" and that he "touched on several facets of the question[s]," including "both tactics and strategy in his responses." Dkt. 44-21 at 3.

### D.    Selection

At the conclusion of all four interviews, Mr. Hartz and Ms. Jones narrowed their top selectees to Ms. Cunningham and Mr. Griffin. There is no dispute that both remaining candidates satisfied the minimum qualifications for the GS-13 Supervisor position, as they each had at least one year of specialized experience from their respective GS-12 positions. Likewise, there is no dispute that Mr. Hartz, the sole decisionmaker, did not review any candidates' prior performance evaluations. Hartz Dep. 35:2–17, dkt. 44-9 ("Performance appraisals are not part of the selection process.").

Mr. Hartz relied primarily on the candidates' resumes and interview performances to gauge the strength of their technical expertise, leadership, innovation, and customer service. *Id.* at 51:3–10, 96:1–19. Though Ms. Cunningham had superior technical expertise in federal benefits, she and Mr. Griffin ranked similarly in their leadership skills. Specifically, Mr. Hartz recognized that Ms. Cunningham had "a lot of experience in benefits teams" at DFAS, while Mr. Griffin "brought a lot of outside experience [and] military experience[ ]" to the table." *Id.* at 99:24–100:5. Mr. Griffin, however, showed better innovation and customer service skills from his time at the Customer Care Center, *id.* at 100:9–19, which ultimately led Mr. Hartz to conclude that Mr. Griffin "brought a broader skills mix to the table" and was the most qualified person for the role. Hartz EEOC Decl. at 8, dkt. 44-21.

Mr. Griffin's selection for the GS-13 Supervisor position was announced on June 18, 2018. Somewhere around that time, Mr. Hartz explained to Ms. Cunningham that she was not selected because "he was looking for a more rounded person." Cunningham Dep. 82:1, dkt. 44-1.

### E.    The MD-715 Report

For Fiscal Year 2018, DFAS collected department-wide data on minority representation in upper management into the Management Directive 715 Equal Employment Opportunity Program Status Report ("MD-715 Report"). Dkt. 49-23. According to this report (and the portions cited by Ms. Cunningham), only 3.57% of qualified African American females were selected for GS-11 through GS-15 promotions, compared to a 15.38% selection rate for African American males. *Id.* at 28. Relatedly, African American females represented 20.59% of the GS-12 rank within HR but only 5.26% of the GS-13 rank. *Id.* at 26.

### F.    The First EEOC Complaint

On August 7, 2018, Ms. Cunningham filed a formal complaint of discrimination, averring that her non-selection for the GS-13 Supervisor position was the product of race/color, sex, and age discrimination. Cunningham EEOC Decl. at 2–3, dkt. 44-2. DFAS accepted Ms. Cunningham's allegations for investigation on August 10, 2018. Dkt. 44-6 at 1.

According to Ms. Cunningham, she "ha[d] been consistently looked over for promotion," despite "feel[ing] like [she] was the best qualified for the position." Cunningham EEOC Decl. at 3, dkt. 44-2; dkt. 44-5 at 1. Her evidence was "just [Mr. Hartz's] verbal conversation with [her], where he stated that he wanted a more well-rounded person for the

position." Cunningham EEOC Decl. at 3, dkt. 44-2. Her race/color discrimination claim rested on her belief that "they wanted someone else to work with" and that Mr. Griffin had been "placed" in the Call Center, "knowing the [GS-13] vacancy was coming open," so that she "would have less footing to stand on due to [them] being of the same race/color." *Id.* at 7. Ms. Cunningham believed she was discriminated against based on sex because "[t]he selecting official preferred a male," *id.*, which belief she described in her deposition as "[h]eartfelt," Cunningham Dep. 108:24–109:8, dkt. 44-1. Finally, she alleged age discrimination because she was retirement eligible while Mr. Griffin was not. Cunningham EEOC Decl. at 7, dkt. 44-2. Overall, the crux of Ms. Cunningham's allegations was that she was "imminently more qualified than the selectee," based on his lack of federal benefits and supervisory experience. *Id.*

On November 3, 2021, DFAS issued a Final Agency Decision wherein it concluded that Ms. Cunningham did not demonstrate that she had been discriminated against. Specifically, DFAS explained that management articulated legitimate, non-discriminatory reasons for its hiring decision; that record evidence and testimony suggested management's stated reasons were credible; and that Ms. Cunningham failed to provide sufficient persuasive evidence to undermine management's reasons. Dkt. 44-20 at 7. The Final Agency Decision also informed Ms. Cunningham of her right to sue in federal district court within ninety days. *Id.* at 9.

### G.   The Second EEOC Complaint

On August 14, 2020, Ms. Cunningham filed a second EEOC complaint, claiming that the 2017 desk audit revealed her GS-12 position should have been ranked as GS-14.

As an incumbent who had been successfully performing her job duties for nine years, she therefore believed that she "should have been non-competitively promoted to GS-13/14." Dkt. 44-7 at 1. Notwithstanding her prior assumptions about the desk audit, Ms. Cunningham reviewed the audit during her deposition and acknowledged that nothing therein suggested her position should have been reclassified to a higher grade. Cunningham Dep. 133:14–16, dkt. 44-1. Whatever the merits of this second EEOC complaint, it was ultimately dismissed as untimely. *Id.* at 126:7–9. In her Statement of Claims filed on November 16, 2022, Ms. Cunningham did not reference this noncompetitive promotion claim. Dkt. 34.

### H.    This Lawsuit & Subsequent Developments

On January 21, 2022, Ms. Cunningham sued her employer, arguing that it discriminated against her on the basis of her sex and race by selecting "a less qualified African American male" for the GS-13 Supervisor position. Dkt. 1. In August 2022, Mr. Griffin left DFAS, vacating the GS-13 Supervisor position. Ms. Cunningham applied for and, this time, was selected as the GS-13 Supervisor. Accordingly, she seeks to recover damages for the approximate four years that she was a GS-12 rather than a GS-13. Defendant moved for summary judgment on May 10, 2023, which motion is now fully briefed and ripe for ruling.

## III.    DISCUSSION

### A.    Title VII

Title VII prohibits employers from discriminating against an individual on the basis of protected characteristics, such as sex and race. 42 U.S.C. § 2000e-2(a)(1). A complainant

can establish that her employer discriminated against her by demonstrating that sex or race "was a motivating factor . . . for the challenged employment practice." *Id.* § 2000e–2(m). Accordingly, a Title VII plaintiff will survive summary judgment if a trier of fact would find that, at the time of the adverse employment decision, the employer was motivated by the employee's sex, race, or other protected characteristic. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (discussing disparate treatment claims).

Here, Ms. Cunningham contends that her employer discriminated against her in violation of federal law by not selecting her for the GS-13 Supervisor position because of her sex and race.[6] She asserts an intersectional "sex-plus" theory of discrimination, arguing that she experienced discrimination based on sex in conjunction with another characteristic, namely, her race. Though the Seventh Circuit has "not yet decided" whether to recognize this iteration of Title VII protection, it has acknowledged that the term "sex-plus" is "simply a heuristic . . . developed in the context of Title VII to affirm that plaintiffs can, under certain circumstances, survive summary judgment even when not all members of a

---

[6] Ms. Cunningham's claim in this lawsuit is framed as a disparate treatment cause of action—not disparate impact, which involves a challenge to an employment practice that, while facially neutral, impacts a particular group unfavorably and cannot be justified by business necessity. *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). Disparate impact claims require plaintiffs: (1) to identify a specific, facially neutral employment practice that is "allegedly responsible for an[ ] observed statistical disparit[y]"; and (2) to offer statistical evidence that the challenged policy caused that disparity. *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005) (internal citations omitted). Ms. Cunningham's reference to the MD-715 Report in her factual averments would be relevant, if at all, only to a disparate impact claim. *See generally* Pl.'s Resp. at 19–20, dkt. 48. Nowhere beyond this passing reference does she develop her argument. Because courts are not "obliged to research and construct legal arguments for the parties," we decline further exploration of evidence left untethered by a party to a legal argument. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

disfavored class are discriminated against." *Coffman v. Indianapolis Fire Dep't.*, 578 F.3d 559, 564 (7th Cir. 2009) (addressing claim of discrimination based on sex plus height).

Since the Seventh Circuit's most recent discussion of "sex-plus" discrimination claims in *Coffman*, several district courts within this judicial circuit have allowed sex-plus claims to proceed, reasoning, in part, that the EEOC Compliance Manual expressly protects individuals from intersectional discrimination based on multiple protected characteristics. EEOC Compliance Manual, Section 15: Race and Color Discrimination, at https://www.eeoc.gov/laws/guidance/section-15-race-and-color-discrimination#IVC  (last visited November 29, 2023) ("Title VII prohibits discrimination not just because of one protected trait (e.g., race), but also because of the intersection of two or more protected bases (e.g., race and sex)."); *see*, *e.g.*, *Kimble v. Wis. Dep't of Workforce Dev.*, 690 F. Supp. 2d 765, 770 (E.D. Wis. 2010) ("African-American men, like African-American women, may bring intersectional claims."); *Chaikin v. Methodist Med. Ctr. of Ill.*, No. 18-cv-1208, 2018 WL 4643016, at *2 (C.D. Ill. Sept. 27, 2018) ("[T]he Court has seen examples of intersectional forms of discrimination under a *single* statute advance before federal courts—for example race and gender under Title VII . . . .").[7]

---

[7] We note, too, that many of the federal circuits permit intersectional discrimination claims to proceed. *Jefferies v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025, 1032 (5th Cir. 1980) (race and sex); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1416–17 (10th Cir. 1987) (race and sex); *Lam v. Univ. of Haw.*, 40 F.3d 1551, 1562 (9th Cir. 1994) (race and sex); *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 958 (6th Cir. 2014) (race and sex); *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643 (4th Cir. 2021) (sex and age). *Cf. Bryant v. Int'l Schs. Servs., Inc.*, 675 F.2d 562, 573 n.18 (3d Cir. 1982) (sex and marital status); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 118 (2d Cir. 2004) (sex and parenthood status); *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 43 (1st Cir. 2009) (sex and parenthood status).

Notwithstanding the viability of a sex-plus discrimination claim, a plaintiff alleging any version of sex discrimination must proffer evidence that sex was a motivating factor in her non-selection for a promotion. *Coffman*, 578 F.3d at 563–65; 42 U.S.C. § 2000e–2(m). In other words, the plaintiff must show that she suffered an adverse employment action "at least in part because she is female." *Coffman*, 578 F.3d at 564. To satisfy this burden, plaintiffs may use the *McDonnell Douglas* "burden shifting analysis." *David v. Bd. of Trs. Of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Under that frame-work, the plaintiff must first demonstrate a *prima facie* case that she (1) belongs to a pro-tected class, (2) meets her employer's legitimate performance expectations, (3) suffered an adverse employment action, and (4) was treated worse than similarly situated employees outside the protected class. *Id.* at 225. Assuming that the plaintiff satisfies each element of her prima facie case, the burden shifts to the defendant to articulate a legitimate, nondis-criminatory reason for its action, at which point the burden returns to the plaintiff to show that the defendant's reason was pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

### A.    Ms. Cunningham's Prima Facie Case

Here, Defendant does not contest Ms. Cunningham's prima facie case of sex dis-crimination. First, as an African American woman, she clearly belongs to a protected class. Second, the undisputed facts show that she met her employer's legitimate performance ex-pectations. Third, she suffered an adverse employment action when she was not selected for the GS-13 Supervisor position. Lastly, a similarly situated person outside her protected

class, namely, Mr. Griffin who was an African American male, was treated better than she when he was selected for the position.

**B.    Defendant's Legitimate Nondiscriminatory Reasons for Ms. Cunningham's Non-selection**

Defendant argues that it had legitimate, nondiscriminatory reasons for selecting Mr. Griffin over Ms. Cunningham; to wit, he had a stronger resume, a better interview, a broader mix of skills, and a strategic approach that, combined, made him better qualified. It is well-established that an employer may hire someone it believes is best qualified for a position. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009) (hiring better qualified person is a nondiscriminatory action). Courts do "not sit as a superpersonnel department that reexamines an entity's business decisions," and the qualifications for a position, albeit subjective, are precisely the type of business decision with which the judicial apparatus ought not interfere. *Baron v. City of Highland Park*, 195 F.3d 333, 341 (7th Cir. 1999) (internal quotation and citation omitted); *see also Murray v. Golden Rule Ins. Co./United Health Corp.*, 23 F. Supp. 3d 938, 953 (S.D. Ind. 2014) (stating that courts do not "weigh[ ] the prudence of employment decisions"). Accordingly, Defendant has satisfied its burden of providing a legitimate, nondiscriminatory explanation for Ms. Cunningham's non-selection.

**C.    Pretext**

Once an employer proffers a legitimate nondiscriminatory reason for the plaintiff's non-selection, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered . . . were a pretext for discrimination." *Texas Dep't. of Cmty. Affairs*

20

*v. Burdine*, 450 U.S. 248, 253 (1981) (citation omitted). Pretext is "a lie, specifically a phony reason for some action," or "an employer's efforts to cover its tracks and hide the real reasons for not selecting an applicant." *Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 746 (7th Cir. 2021) (internal quotations and citations omitted). A showing of pretext—without more—is insufficient; a plaintiff must also show that the employer acted on prohibited animus. *Id.* at 747.

Our sole concern regarding the issue of pretext is the honesty of the decisionmaker's explanation. *O'Connor v. DePaul Univ.*, 123 F.3d 665, 671 (7th Cir. 1997). Because courts are not superpersonnel departments, a decisionmaker's sincere, nondiscriminatory beliefs do not offend the law. *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004). Thus, an employer's mistaken or incorrect conclusions do not evince pretext. *Baron*, 195 F.3d at 341 (explaining that "the overall correctness or desirability of the reasons proffered is not relevant to the determination of pretext . . . , [d]espite the plaintiff's contentions to the contrary, [when] there is no evidence in the record to demonstrate that any of the[ ] reasons are fallacious").

Faced with Defendant's legitimate, nondiscriminatory reasons for Mr. Griffin's selection, Ms. Cunningham attempts to thread a pretextual needle, arguing that she was significantly more qualified than Mr. Griffin. She bases this argument on her subjective view of her own qualifications and unsubstantiated speculation of the decisionmaker's state of mind, but, at bottom, she fails to create a genuine issue of material fact that precludes summary judgment.

Though selection of a less-qualified candidate may serve as probative evidence of pretext, the difference in qualifications "must be a significant one." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 738 (7th Cir. 2006) (citing *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 458 (2006)). "[U]nless th[e] differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue," competing qualifications are ordinarily insufficient to evince pretext. *Mlynczak v. Bodman*, 442 F.3d 1050, 1059 (7th Cir. 2006) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169 (7th Cir. 2002)) (internal quotation marks omitted). To succeed on this theory of pretext, the plaintiff must demonstrate that her comparative qualifications are "clearly superior" or "significantly better" than the selectee's qualifications. *Id.* at 1060 (quoting *Ash*, 546 U.S. at 457–58).

Ms. Cunningham has not produced evidence to show that she was either clearly or significantly better qualified than Mr. Griffin. The record evidence instead shows that, although only partially captured in her resume, Ms. Cunningham's many years of experience in federal benefits were known to Mr. Hartz at the time of his decision. Though her greater length of service at DFAS is undisputed, so too are Mr. Griffin's credentials, including a college degree, an MBA, relevant military and private sector experience, numerous military awards, and various certifications. *See, e.g.*, *Rowe v. Shulkin*, No. 17-cv-9258, 2019 WL 2060951, at *14 (N.D. Ill. May 9, 2019) (seniority alone did not evince pretext when selectee had superior college performance, a master's degree, specialized training, military awards, and other relevant leadership experience) (citing cases). Further, Ms. Cunningham has produced no evidence (beyond mere speculation) to contradict Mr. Hartz's stated

impression that her interview responses "were the least thorough of any of the interviewees." Dkt. 49-13 at 9. Therefore, Ms. Cunningham has not satisfied her burden of establishing that reasonable persons of impartial judgment would find that she was clearly better qualified for the GS-13 Supervisor position than Mr. Griffin.

Courts have repeatedly stressed that employers are entitled to act on their honest, subjective evaluations of an applicant's qualifications. *See Blise v. Antaramian*, 409 F.3d 861, 867–68 (7th Cir. 2005). Aside from a subjective appraisal of her own credentials, Ms. Cunningham offers no evidence to undermine Mr. Hartz's honest assessment that favored Mr. Griffin. Rather, she has conceded the non-pretextual grounds for her non-selection. For instance, Ms. Cunningham stated in her deposition that Mr. Hartz likely "thought Mr. Griffin was more suitable," "wanted a more well-rounded person for the position," and maybe "wanted something different . . . for the benefits division . . . and felt like he could take that or do that with someone other than myself." Cunningham Dep. 109:23–110:24, 103:6–16, 109:9–22, dkt. 44-1. No doubt Ms. Cunningham was also qualified for the GS-13 position, but her personal beliefs are no substitute for Mr. Hartz's honest and well-intentioned beliefs about who ultimately qualified as the best selectee.

Ms. Cunningham next argues that Mr. Hartz improperly deviated from DFAS interview policy by asking "non-job related [sic] questions." Pl.'s Resp. at 17, dkt. 48. Deviation from internal policy may indeed evince pretext, *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 931 (7th Cir. 2020), but such deviation must also be discriminatorily motivated and prejudicial to the plaintiff. *Guinto v. Exelon Generation Co., LLC*, 341 F. App'x 240, 247 (7th Cir. 2009) (stating that consistent "misapplication" of internal policy does not evince

pretext); *see also Monroe v. City of Lawrence, Kan.*, 124 F. Supp. 3d 1097, 1118 (D. Kan. 2015) (explaining that the "mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent"). Absent any legitimate explanation, an employer's "highly unusual" deviation from normal practice regarding a single employee can signal pretext. *Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th Cir. 2017). On the other, an employer's (perhaps erroneous) reading of an internal policy—so long as applied consistently to all employees—does not cast doubt on the employer's legitimate, nondiscriminatory explanations. *Ellis v. United Parcel Serv.*, 523 F.3d 823, 829–30 (7th Cir. 2008).

Here, DFAS's internal policy required that "[a]ll questions used in a selection interview must be job related and tied to the skills or competencies identified in the job analysis. The same questions, in the same order, should be asked of all applicants who are interviewed." Dkt. 49-19 at 20. It is undisputed that Mr. Hartz asked each candidate the same six questions and provided the same two questions in advance. *But see Blise*, 409 F.3d at 868 (noting that there is no legal requirement under Title VII to ask the same questions of different applicants). Ms. Cunningham's critique that the interview questions were "generic, vague, and sought general human resources experience" leaves undeveloped any argument that they were crafted with discriminatory intent or prejudicial effect. Pl.'s Surreply at 14–15, dkt. 56. In fact, the undisputed record shows that these purportedly "non-job-related" interview questions were derived from the responsibilities enumerated in the vacancy announcement and were asked to each candidate; thus, insofar as the questions fell

24

out of compliance with DFAS policy, Ms. Cunningham has proffered no evidence that the questions were posed with discriminatory intent or otherwise prejudiced her based on sex.

Ms. Cunningham also challenges the length of her interview, calling attention to the fact that Mr. Griffin's interview was appreciably longer than her interview.[8] We are confident that the difference in interview lengths does not, in this case, indicate pretext. As mentioned above, it is undisputed here that Mr. Hartz asked the same questions of each applicant. Nevertheless, exploring an applicant's background, professional qualifications, and "personality, poise, and manners"—i.e., a fundamental undertaking in an interview—is "often a give-and-take process" hardly capable of uniform repetition from candidate to candidate. *Blise*, 409 F.3d at 868. Mr. Hartz's recollection that Ms. Cunningham had the "least thorough" responses, coupled with her own admission that she did not readily offer information, leaves her shorter interview time entirely plausible and her criticism a far cry from being evidence of pretext. Ms. Cunningham's efforts to undermine the integrity of the interview process rest on nothing more than conjecture and, thus, do not create a triable issue of fact for a jury.

Finally, Ms. Cunningham asserts that Mr. Hartz's use of the military terms "tactical" and "strategic" to describe candidates' interview responses evinces bias toward males because "the military is predominately male." Pl.'s Resp. at 34, dkt. 48. The record discredits this conclusion, as Mr. Hartz testified that he did not necessarily borrow these terms from

---

[8] Though the record is unclear as to the specific amount of time formally allotted for each interview, Defendant does not dispute Ms. Cunningham's averment, premised on her and Mr. Griffin's deposition testimonies, that Mr. Griffin's interview was longer. As explained above, any such difference in time spent on the respective interviews is immaterial.

the military; rather, he utilized these terms "to interpret things [he was] seeing in different candidates." Hartz Dep. 27:14–28:7, dkt. 44-9. Moreover, Mr. Hartz used "tactical" to describe responses from Mr. Opat, a Caucasian male, *see* dkt. 44-17, undermining the theory that Mr. Hartz's terminology was coded with improper bias. Even accepting that these descriptive terms were wholly derivative from the military, neither term relates to prohibited sex-based stereotypes, and Ms. Cunningham has not pointed to any legal authority concluding otherwise.

A holistic view of the evidentiary record does not suggest that Mr. Hartz's GS-13 selection was the product of sex (or sex plus race) discrimination. Based on the undisputed facts before us, no reasonable trier of fact could find that Ms. Cunningham's sex was a motivating factor in her non-selection for the GS-13 Supervisor position. Ms. Cunningham cannot defeat summary judgment by relying on her suppositions that are ultimately not borne out by the facts. *Rothman v. Emory Univ.*, 123 F.3d 446, 453 (7th Cir. 1997). Accordingly, we grant Defendant's motion for summary judgment on Ms. Cunningham's discrimination claim.

### B. Abandoned Claims

Before concluding, we briefly remark on two claims omitted from Ms. Cunningham's Statement of Claims but included in her responsive brief (1) that Mr. Locke should have selected her in November 2017 at the close of the application window; and (2) that she should have been non-competitively promoted to a GS-13/14 position after the 2017 desk audit. *See* Pl.'s Resp. at 24, dkt. 48.

Courts in this district have consistently held (and the Seventh Circuit has affirmed) that failure to assert a claim in a Statement of Claims, even if such claim arises under the same statute, operates as an abandonment of that claim. *Jackson v. Regions Bank*, No. 1:19-cv-01019-JMS-MPB, 2020 WL 4430588, at *4–5 (S.D. Ind. July 31, 2020), *aff'd*, 838 F. App'x 195 (7th Cir. 2021) (collecting cases). As Defendant points out, had Ms. Cunningham included these additional claims in her Statement of Claims, dkt. 34, it could have addressed them in its opening brief and designated appropriate evidence. Def.'s Reply at 2, dkt. 51. Ms. Cunningham offers no rebuttal to this argument in her surreply. *See generally* Pl.'s Surreply, dkt. 56. Accordingly, we find that she has effectively abandoned the two claims omitted from her Statement of Claims.

Even if these claims had not been abandoned, they would still fail for separate reasons. First, Ms. Cunningham takes issue with Mr. Hartz, rather than Mr. Locke, as the selecting official because an internal DFAS policy requires selection within 120 days of the close of a vacancy announcement. Dkt. 49-19 at 19. Here, the vacancy announcement closed at the end of November 2017, but Mr. Hartz did not make his selection until June 18, 2018, almost eight months later. This delay, Ms. Cunningham contends, indicates discriminatory pretext. However, as she readily acknowledged in her deposition, the interviews were postponed so that Mr. Hartz, as the incoming GS-14 Chief, could make the selection. Cunningham Dep. 62:12–16, dkt. 44-1. Moreover, the DFAS policy explicitly allows certain exceptions, provided that the requesting party "work[s] with the staffing specialist." Dkt. 49-19 at 19. Indeed, as previously explained, pretextual deviation from internal policy must be accompanied with discriminatory intent or prejudicial effect. *Joll*,

953 F.3d at 931; *Guinto*, 341 F. App'x at 247. Here, Ms. Cunningham has produced no evidence that postponing the GS-13 Supervisor selection was a discriminatorily motivated decision or that it prejudiced her because of her sex.

Second, Ms. Cunningham's noncompetitive promotion claim fails on separate grounds: she did not exhaust her administrative remedies and, even if she had, the documentary evidence plainly belies the veracity of her claim. A Title VII plaintiff must exhaust administrative remedies before filing suit in federal court. *Hill v. Potter*, 352 F.3d 1142, 1145 (7th Cir. 2003); *Reynolds v. Tangherlini*, 737 F.3d 1093, 1099 (7th Cir. 2013). According to the applicable administrative procedure, a federal employee must contact a Counselor within forty-five days of the aggrieved incident. 29 C.F.R § 1614.105(a). If no timely resolution results, the Counselor notifies the complainant of her right to file a formal complaint with the relevant agency. *Id.* § 1614.105(d). Only after the agency authorizes federal suit may the complainant sue her employer.

Here, Ms. Cunningham filed her second EEOC complaint on August 14, 2020, alleging that, per the 2017 desk audit, she should have been non-competitively promoted in April 2018—well past the forty-five-day deadline to file such a complaint. In fact, this noncompetitive promotion claim has already been dismissed as untimely. Even if such claim were properly before us, Ms. Cunningham has expressly acknowledged in her deposition that the 2017 desk audit reported no such conclusion; rather, it stated that her position was correctly categorized as GS-12 and in no way suggested that she was entitled to a noncompetitive promotion.

28

Notwithstanding the explications provided above, we regard the claims omitted from Ms. Cunningham's Statement of Claims as abandoned.

## CONCLUSION

For the reasons explicated above, Defendant's Motion for Summary Judgment is **GRANTED**. Dkt. 44. Final judgment shall be entered accordingly.

IT IS SO ORDERED.


Date:

_____12/1/2023_____

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana


Distribution:

Rachana Nagin Fischer
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
rachana.fischer@usdoj.gov

Tae K. Sture
STURE LEGAL SERVICES LLC
tae@sturelaw.com